### UNITED STATES v. SCHACHTRUP.
### No. 8367.

Circuit Court of Appeals, Seventh Circuit.
Feb. 9, 1944.

Edward T. O'Connor, Irwin S. Rubelle, and John E. Dougherty, all of Peoria, Ill., for appellant.

Howard L. Doyle, George R. Kennedy, and Marks Alexander, U. S. Attys., of Springfield, Ill., and Michael A. Shore, of Peoria, Ill., for appellee.

Before EVANS, KERNER, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

The defendant-appellant, Herman J. Schachtrup, appeals from a judgment of the United States District Court for the Southern District of Illinois, Northern Division, entered upon a jury verdict which found that he and his son, Francis Bernard Schachtrup, had conspired to evade the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix § 311.

The indictment in the fifth count charged the appellant and his son with conspiring to obtain for the son a deferred classification as a farmer by means of false and fraudulent representations to the Draft Board concerning the skill and experience of the son as a farmer. A demurrer to the indictment was overruled as to this count. At the conclusion of all of the evidence, the appellant filed a separate motion for a directed verdict, which the court took under advisement. After the case had been submitted to the jury and a verdict of guilty returned, the court overruled the motion.

The appellant has assigned and urged chiefly as errors the insufficiency of the indictment, the insufficiency of the evidence to support the verdict, the improper admission of evidence, and a certain instruction to the jury. We lay to one side the consideration of all questions except the alleged insufficiency of the evidence to sustain the verdict of the jury.

In our examination of this record, we have recognized the elementary rule that if there is any evidence, viewing it most favorably to the Government, to support the verdict, we must affirm. We have examined this record carefully, and we find no evidence to sustain the verdict of the jury. Viewing the evidence most favorably to the Government, we gather from the record the following facts:

The appellant owned and operated a barber college in Peoria, Illinois. In addition, he owned and operated through various tenants several good-sized farms in the same community. Francis was his only son, and the appellant had always cherished the hope that Francis would become a farmer. While Francis was still in high school and long before the events alleged in the indictment took place, the appellant took him to a prominent lawyer in Peoria to get advice about his future career; and the lawyer advised Francis then that since he was the only son of the appellant and would eventually inherit the farms, he should become a farmer. Francis was not keen about farming, but at the time preferred to play baseball. Later, but while still in high school, he began to prepare himself for the barber trade by enrolling as a student barber in his father's barber college where he worked after school, on Saturdays, and during vacations. Over a two-year period, 1941 and 1942, this training totalled 1,480 hours. His father once made arrangements for him to work in a barber shop in a nearby small town and had the neighboring barber sign Francis' application for an apprentice card.

After graduation from high school in June of 1942, Francis became a full time student at his father's barber college, and it was during this period that he filled out the first occupational questionnaire and filed it with the Draft Board on or about August 14, 1942. He represented that he was a high school graduate and a full time student in the barber college and that the date when he expected to complete this course was indefinite.

Francis continued to work in the barber college until September of 1942, when, at

his father's suggestion and that of other members of his family, he enrolled as an agricultural student at the University of Illinois. However, following the counsel of a professor at the University who had suggested that young men with farms should return home to operate them rather than remain at the University, he left the University in October of 1942, against the wishes of his father. Upon his return home, his father told him that he had spent enough money on him at the University and that he wanted him to go back, but, if he would not go back, then he would have to go down on the farm and go to work. Accordingly, Francis went to live with John Stadsholt, a tenant on a 196-acre farm, part of 344 acres which the appellant and his wife had contracted to sell to Francis at the time of his graduation from high school. This 196-acre farm was adjacent to one occupied by a tenant named Ben Lindaur, who was moving off in March, 1943. Francis and Stadsholt planned to operate both farms as soon as Lindaur should leave. In November, 1942, the mother and aunt of Francis appointed him to take care of their farms and act as supervisor thereof. The aunt told the tenants on the farms that if the F. B. I. or any (other) Government men came around asking questions, she and Francis' mother wanted the tenants to say that Francis was managing the farms.

On November 18, 1942, Francis filed a second Selective Service questionnaire with the Draft Board. This was filled out for him by an attorney who was an associate member of the Advisory Committee of Peoria County, whose purpose is to help Selective Service registrants fill out their questionnaires. In this questionnaire, Francis represented that he had had four years' experience in farming covering a period of the last seven or eight years; that his average annual earnings were undetermined but could be estimated at approximately three thousand dollars; and that he owned the farm he was working on. He set forth in detail the acres under cultivation and the amount of livestock. After the filing of this affidavit, the Board classified Francis as 1-A.

There is no evidence that the appellant had anything to do with making out the questionnaires filed by Francis with the Draft Board.

After Francis had been classified 1-A by the Draft Board, he went to three of his father's tenants and obtained letters from them, which he presented to the Draft Board. Copies of these letters, omitting the formal parts and signatures, are set forth in the margin.[1] There is no evidence that the appellant had anything to do with the procurement or the writing of these letters. In fact, the only evidence in the record is to the effect that he knew nothing about them and had nothing to do with their procurement or writing.

On January 7, 1943, Francis filed an application for a deferred classification. This application was prepared for him by attorney Dougherty, in his capacity as a member of the Advisory Committee. There is no evidence that the appellant knew anything about it. After the preparation of the application, Francis requested Dougherty to appear with him before the Draft Board, but he was advised by Dougherty that that was not permissible. Francis thereupon sought to prevail upon his father to appear with him before the Draft Board. This his father reluctantly agreed to do.

The two questionnaires and Francis' application for deferment and letters in support thereof were discussed by Francis and the appellant with the Draft Board. What the appellant said or did at this hearing before the Draft Board does not appear. There is no evidence that he knew what representations Francis was going to make. Neither does the evidence show that the appellant approved of, or made, any false representations to the Board himself. There is not even any evidence as to which representations were discussed before the Board.

After this interview, Francis was reclassified 2-C, and deferred as a farmer. The members of the Draft Board testified

---

[1] "I have known Francis Bernard Schachtrup for the past eight years he has worked with me on the Farm more times and I find him a good worker and a good farmer. I would like for him work on the farm for me."

"I recommend Francis Bernard Schachtrup as a good worker and a first class farmer.

"He understands land and good farming and should be left farming."

"I have known Francis Bernard Schachtrup since 1936 and I have found him to be a very good worker and a very good farmer and he should be left on the farm."

that this classification had not been changed up to the time of the trial and that they had no reason to change it. The Chairman of the Board testified that he believed it right and proper that Francis should be placed in 2-C.

One of the students at the barber college testified that the appellant had often talked about wanting Francis to work on the farms and had offered to hire the witness by the month to help Francis run a farm, stating that he and Francis would be better off on a farm and that possibly if they were on a farm they would be deferred. There was evidence that in the summer of 1941 the appellant had stated to one witness that he wanted Francis to go on the farm but that the boy did not care anything about it.

A year or two previously, the witness and the appellant had talked about the possibility of Francis' being called into the Army, and the witness testified that on this occasion the appellant had said that "So and so in Washington started this thing let him fight it; I am not going to have my son."

This isolated statement made before there was a Selective Service Act is no evidence of conspiracy. To project into the future this remote, unconnected statement of a distraught and anxious father as evidence of a conspiracy to violate a law that did not exist would be improper.

The most that all of this evidence might be held to show is that Francis and the appellant agreed to try to get an agricultural deferment for Francis. This they had a perfect right to do. There was nothing unlawful about it. If in their efforts to obtain such a lawful deferment they used no unlawful means, made no false representations, and practiced no fraud or deception upon the Board, but revealed fairly to the Board the facts and circumstances as they actually existed, then there is no evidence of conspiracy. The evidence in this case does not show that there was any misrepresentation as to the facts, or any agreement to misrepresent the facts.

■ The Government points to the representations of Francis in the second questionnaire that he had had four years of experience in farming covering a period of seven or eight years and that his average annual earnings were undetermined but estimated to be approximately three thousand dollars, as representations which the jury might have determined to be false. The representation as to the earnings was indicated as only an estimate, undetermined, and not as a fact. As to the other representation, it is undisputed in the evidence that over a period of seven or eight years Francis had worked off and on on his father's farms. Is this overstatement of Francis' experience such a misrepresentation as will support an inference that father and son were conspiring to evade the draft law? We think not.

"A conspiracy is sufficiently described as a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means, * * *." Pettibone v. United States, 148 U.S. 197, 203, 13 S.Ct 542, 545, 37 L.Ed. 419.

■ As we have pointed out, it is not unlawful to seek, or agree to seek, an agricultural deferment. This is authorized by the Selective Service Act. And so, the fifth count of the indictment, if it charged any offense at all, charged an agreement to carry out a purpose not in itself criminal or unlawful, but by criminal or unlawful means. The evidence in this case discloses no agreement to use unlawful means to obtain a deferment. Neither does it show that any unlawful means was employed. Consequently, there could have been no conspiracy. Marino v. United States, 9 Cir., 91 F.2d 691, 113 A.L.R. 975, certiorari denied 302 U.S. 764, 85 S.Ct. 410, 82 L.Ed. 593; United States v. Food and Grocery Bureau of Southern California, D.C., 43 F.Supp. 966, 973.

Since there was no evidence to support the verdict, the motion of the appellant for a directed verdict should have been sustained. The judgment is reversed and the cause remanded, with directions to the District Court to proceed in accordance with this opinion.